# Exhibit H



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

April 21, 2006

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Stein et al., S1 05 Cr. 888 (LAK)**

Dear Judge Kaplan:

The Government submits this letter in compliance with the Court's April 7, 2006 Order requiring that the Government submit a bill of particulars stating "With respect to each of the tax shelters as to which the government intends to offer proof, does the government allege that the tax shelter was fraudulent as designed and approved by KPMG and, if so, in what respects?"[1]

As an initial matter, various defendants' motion papers appear to take the position that the template opinion letters relating to the transactions described in the Indictment as FLIP/OPIS, BLIPS, and SOS constitute a description of the transactions "as designed." The Government disagrees and intends to prove at trial that these transactions "as designed" are as set forth below, not as set forth in the template opinion letters. The Government alleges that these opinion letters do not reflect the transactions "as designed," but instead contain misleading information, false statements, and material omissions designed to disguise the transaction and mislead the IRS. Moreover, the

[1] The Court's Order refers to design and approval "by KPMG," but the Government alleges that the conspirators, including but not limited to KPMG, participated in the design and approval of the tax shelter transactions described in the Indictment. For example, Presidio, banks and the defendant Ruble participated in designing these transactions or portions thereof, and in some sense approved of the implementation of those transactions. Thus, in this response, the Government refers to the design and approval by the conspirators.

Government alleges that the conspirators drafted these opinion letter so that they misrepresented not only the facts of the transaction, but also conspirators' conclusions regarding the application of the law to the facts. Thus, while the opinions state that certain tax treatments of certain facts (falsely) described in the opinion letter are more likely than not to survive IRS challenge, the Government alleges that conspirators did not, in truth, believe that to be so.

Nevertheless, in addition to complying with the Court-ordered particulars disclosure by describing below the Government's allegations regarding the transactions as designed and approved and the manner in which the designs were fraudulent, the Government also sets forth its position on whether it would be criminally fraudulent to advise the claiming of tax benefits as a result of transactions that actually occurred as described in the opinion letters (assuming no material facts were omitted from that description).

**BLIPS**

With respect to BLIPS, the Government alleges that BLIPS was fraudulent as designed and approved by the conspirators. BLIPS was designed and approved by the conspirators to be a short-term tax shelter program terminating prior to calendar year-end, and virtually always within approximately 67 days. BLIPS was designed and approved by the conspirators to include a purported non-recourse loan and loan premium from a bank. As designed, the proceeds of the purported loan and loan premium would not be used by a BLIPS client to make, leverage or secure pegged currency investments. BLIPS was designed and approved by the conspirators so that this purported loan and loan premium would nominally be advanced to a BLIPS client and assumed by an entity, but would not be placed at risk and would not at any time leave the custody of the bank. As designed, the entire proceeds of the purported loan and loan premium remained in the custody of the bank as collateral for the obligation to repay the loan and loan premium to the bank. BLIPS was designed and approved by the conspirators so that entire amount of the purported loan and loan premium would be repaid to the bank at the end of the transaction and prior to year-end. BLIPS was designed and approved by the conspirators so that it would not include a bona fide, above-market, fixed-interest loan, but instead through the use of a retroactive interest-rate swap would include a floating, market rate purported loan. BLIPS was designed and approved by the conspirators so that it included a nominal investment that (1) was purchased with the clients' money and was not financed, leveraged, or secured by, and did not serve as collateral for, the purported loan and loan premium, (2) had a fixed, down-side risk of loss, and (3) had only a remote

possibility of resulting in a large return on the nominal amount of the clients' money that was used for this investment component.

The above aspects of the BLIPS design were fraudulent. The short-term nature of the transaction meant that there was no real loan premium, no realistic possibility of making a reasonable pre-tax profit, no contingency to the obligation to repay the loan premium, and no purpose for the purported borrowing except to generate a tax loss. The design of the loan and loan premium meant that there was not a bona fide loan in BLIPS, that the purported loan and loan premium had no relationship to the nominal investment, and that there was no contingency to the obligation to repay the loan and loan premium. The design of the purported loan and the swap meant that there was no bona fide above-market, fixed-interest loan (and thus no bona fide loan premium). The design of the nominal pegged currency investment meant that the purported loan had no relationship to that nominal pegged currency investment, and the nominal pegged currency investment had only a remote possibility of returning a profit in excess of all BLIPS-related costs and fees.

The above aspects of the BLIPS design were also concealed and misrepresented in the BLIPS opinion letter. Thus, by design, the BLIPS opinion letter concealed the true facts and misrepresented the facts in order to reach various legal conclusions. If the true facts had been presented, the legal principles set forth in the BLIPS opinion letter would have compelled a legal conclusion opposite from that stated by the conspirators.

The Government's position on the facts and discussion set forth in the BLIPS opinion letter is as follows. If a series of transactions were conducted with a business purpose and profit motive and not as part of a pre-arranged plan, and subsequently were accurately described to a tax professional in a manner consistent with the statement of facts and representations contained in the BLIPS opinion letter,[2] and

---

[2]It is far from clear that these conditions could occur for various reasons. For example, it is unlikely that any bank would provide non-recourse loans and permit the loaned funds to be used to make investments on foreign currency contracts, absent sufficient additional posted collateral. Thus, it is unlikely that a financial institution would engage in the transactions described in the BLIPS opinion letter on a "highly leveraged" basis. Moreover, it seems unlikely that any financial institution would provide an above-market, fixed-rate loan with loan premium, without mechanisms

assuming the tax professional believed in good faith the legal analysis of those facts as set forth in the opinion letter, the Government does not allege for purposes of this criminal case[3] that an opinion letter drafted under those circumstances recounting those facts and containing the legal analysis in the BLIPS opinion letter would be criminally fraudulent.[4] However, the BLIPS opinion letter as drafted and approved — prior to the execution of any transactions — falsely misrepresents the series of transactions described therein as not pre-planned or pre-arranged, and instead falsely claims that the transactions were entered into according to one plan (i.e., to engage in three-stage, seven-year investment program), but that in the midst of the transaction, the plan was abandoned; this purported change of plans is critical to the tax treatment described in the opinion letter. Thus, while various bona fide business transactions might be planned or designed such that they might legitimately minimize taxes (and might even involve an opinion issued before the transactions on the expected tax treatment of the planned transactions), BLIPS is not such a transaction. This is because the analysis contained in the BLIPS opinion depends on a change in plans, and therefore the Government alleges

---

(which actually existed in BLIPS) that would convert such a loan and premium into a fully collateralized market-rate loan (with a principal amount equal to sum of the purported loan and premium amounts) the proceeds of which could not be used by the client absent adequate security. Similarly, it seems unlikely that BLIPS clients would seek to obtain a loan that had to be overcollateralized by cash. In other words, it is not likely that a client would obtain a loan that required the client to post $101 in cash in order to use $100 in loan proceeds. And, it is not likely that a client would pay high fees and carrying costs for a purported loan and loan premium unless the client could utilize that money in some manner that had the potential to return an amount greater than those fees and costs. In BLIPS, the clients could not and did not. And a client interested in engaging in forward contracts relating to pegged currencies using only the client's money would not likely incur the high fees and costs relating to the various promoters of BLIPS and the unused loan.

[3]The Government does not concede that such a series of transactions would create the tax effects claimed in BLIPS, nor does the Government concede that claiming (or advising a client to claim) such tax effects would not result in civil liability and penalties.

[4]The allegations of the Indictment relating to the defendants' conspiracy to defraud the IRS (such as by using various methods to conceal the shelters from the IRS and other conduct) would remain regardless of the criminality of the tax positions taken in the opinion letters.

that BLIPS cannot be anything but fraudulent if it is a designed transaction. In other words, the fact that the conspirators drafted but did not issue an opinion letter prior to executing any BLIPS transactions demonstrates that BLIPS was always intended to be and always was a short-term tax transaction designed to be terminated before year-end for tax purposes.

**FLIP/OPIS**

The Government alleges that FLIP/OPIS was fraudulent as designed and approved by the conspirators. FLIP/OPIS was designed and approved by the conspirators as a pre-planned, short-term tax shelter transaction. FLIP/OPIS was designed and approved by the conspirators to involve purported borrowing by a Cayman Islands entity from a bank, which borrowing was purportedly used to purchase the lending bank's stock from the lending bank, which transactions were designed to be reversed on a pre-arranged date. The purported stock purchase by the Cayman Islands entity in FLIP/OPIS as designed and approved in at least some of those transactions included a delayed settlement term that delayed settlement of the purported purchase until the date on which other components of the transaction guaranteed that the purported stock would be purportedly repurchased by the bank. FLIP/OPIS was designed and approved by the conspirators to involve a nominal investment component that (1) was purchased with the clients' money and was unrelated to the purported Cayman Islands borrowing and purported Cayman Islands stock purchase, (2) did not have a reasonable expectation of returning a profit in excess of fees and costs. Although a separate investment in the foreign bank's stock conducted outside the tax shelter by the client had a possibility of resulting in a gain or loss on that stock, this separate investment was unrelated to the Cayman Islands transactions and was artificially combined with the Cayman Islands transactions in order to create the appearance of a more than nominal investment. FLIP/OPIS was designed and approved by the conspirators to involve the payment of fees disguised as payments for investments with the Cayman Islands entity, which entity had virtually no assets other than money paid to it by the client for such warrants, options, or swaps. FLIP/OPIS was designed and approved by the conspirators to involve a foreign person who purportedly acted independently of the other participants and purportedly owned and controlled the Cayman Islands entity, but who in reality was simply a nominee for the conspirators.

These aspects of the FLIP/OPIS design were fraudulent. The short-term nature of the transaction meant that the clients did not have a reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees. The design of the

purported loan and purported stock purchase by the Cayman Islands entity meant that there was no bona fide loan and no bona fide stock purchase. The design of the nominal investment component of FLIP/OPIS meant that it was not related to the purported loan or purported stock purchase (which transactions generated the purported tax effects) and that it did not have a reasonable opportunity to earn a reasonable pre-tax profit in excess of fees and costs. The designed involvement of a foreign person who is a mere nominee meant that there was no bona fide foreign participant in the transaction.

The above aspects of the FLIP/OPIS design were also concealed and misrepresented in the FLIP/OPIS opinion letters. Thus, by design, the FLIP/OPIS opinion letters concealed the true facts and misrepresented the facts in order to reach various legal conclusions. If the true facts had been presented, the legal principles set forth in the FLIP/OPIS opinion letter would have compelled a legal conclusion opposite from that stated by the conspirators.

The Government's position on the facts and discussion set forth in the FLIP/OPIS opinion letters is as follows. If the facts set forth in the opinion letter were (a) true and (b) complete,[5] and if the individuals who participated in creating and issuing the opinion letters believed in good faith the legal analysis of those facts as described in the opinion letters, the Government does not allege for purposes of this criminal case[6]

---

[5]It is far from clear that this could be so. For example, the opinion letters state that transactions were entered into with "the expectation" "for capital appreciation," yet the end result of the various derivative transactions and purported Cayman Islands stock purchase is that the only opportunity for capital appreciation in the transaction is based on the nominal investment made with the clients' money. And, since the call option purchased from the bank by the Cayman Islands entity locked in a 5% loss on the stock purportedly purchased by the Cayman Islands entity, it is unlikely that this transaction could have been conducted "in order to protect" the stock position of the Cayman Islands entity "from a significant drop in the price of Foreign Bank" or was consistent with the stated "expectation" "for capital appreciation." It is also not likely that a financial institution would sell its own stock on 100% margin to a recently formed Cayman Islands entity that had virtually no assets beyond the cash paid to it by the client, no business, and no business plan.

[6]The Government does not concede that such a series of transactions would create the tax effects claimed in FLIP/OPIS, nor does the Government concede that claiming (or advising a client to claim) such tax effects would not result in civil liability and

that an opinion letter based on such facts and analyzing them to result in the tax treatments reached in the opinion letter would be criminally fraudulent.[7]

**SOS**

The Government alleges that SOS was fraudulent as designed and approved by the conspirators. SOS was designed and approved by the conspirators as a pre-planned, short-term tax shelter transaction. As designed, SOS involved two purported virtually offsetting and self-financed options. SOS was designed such that the purported option positions would almost fully offset each other or would both expire worthless, resulting in either a small payment from the bank to the client, or a loss by the client of all funds contributed by the client. SOS was designed such that the purported option positions would not, and as a practical matter could not, be separated.

These aspects of the SOS design were fraudulent. The short-term nature of the transaction meant that the clients did not have a reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees. The designed inseparability and offsetting structure of the purported option positions meant (1) that there was no reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees, and (2) that there were no bona fide long and short option positions but instead there was in reality only a single, small net long position. The aspect of the design that ensured that the options would almost fully offset each other or would both expire worthless meant that there was no reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees.

The above aspects of the SOS design were also concealed and misrepresented in SOS opinion letters. Thus, by design, the SOS opinion letters concealed the true facts and misrepresented the facts in order to reach various legal conclusions. If the true facts had been presented, the legal principles set forth in the SOS opinion letters would have compelled a legal conclusion opposite from that stated by the conspirators.

---

penalties.

[7]The allegations of the Indictment relating to the defendants' conspiracy to defraud the IRS (such as by engaging using various methods to conceal the shelters from the IRS and other conduct) would remain regardless of the criminality of the tax positions taken in the opinion letters.

The Government's position on the facts and discussion set forth in SOS opinion letters is as follows. If the facts set forth in the opinion letters were (a) true and (b) complete,[8] and if the individuals who participated in creating and issuing the opinion letters believed in good faith the legal analysis of those facts as described in the opinion letters, the Government does not allege for purposes of this criminal case[9] that an opinion letter based on such facts and containing the legal analysis set forth in the opinion letter would be criminally fraudulent.[10]

Very truly yours,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: _______/S/____________________
JUSTIN S. WEDDLE
KEVIN M. DOWNING
STANLEY J. OKULA, JR.
MARGARET GARNETT
Assistant United States Attorney
(212) 637-2312

---

[8]It is far from clear that this could be so. For example, a financial institution would not likely permit a shell entity with virtually no assets other than the offsetting option positions and a limited amount of cash to separate the two option positions because unless those positions were paired, the financial institution would be subjected to massive credit risk. And, it is not likely that a client would enter into these option positions with all of the attendant fees and costs, when the client could execute the same investment (i.e., the small net long option position) for far less.

[9]The Government does not concede that such a series of transactions would create the tax effects claimed in SOS, nor does the Government concede that claiming (or advising a client to claim) such tax effects would not result in civil liability and penalties.

[10]The allegations of the Indictment relating to the defendants' conspiracy to defraud the IRS (such as by engaging using various methods to conceal the shelters from the IRS and other conduct) would remain regardless of the criminality of the tax positions taken in the opinion letters.

cc: all defense counsel (by email)