UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,     )
                                     )
           v.                   )
                                     )
ROBERT COPLAN,              )
MARTIN NISSENBAUM,     )
RICHARD SHAPIRO,        )    (S1) 07 Cr. 453 (SHS)
BRIAN VAUGHN,             )
DAVID L. SMITH, and       )
CHARLES BOLTON         )
                                     )
               Defendants.     )

---

## MEMORANDUM OF LAW IN SUPPORT OF
## RICHARD SHAPIRO'S PRE-TRIAL MOTIONS

MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C.
Attorneys for Richard Shapiro
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

Of Counsel:
John J. Tigue, Jr.
Jeremy H. Temkin
Kristy Watson Milkov
Matthew B. Homberger (pending admission)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

    A. Background ........................................................................................... 3

    B. The Transactions ................................................................................. 4

        1. CDS ............................................................................................. 4

        2. COBRA ....................................................................................... 4

        3. Add-On ....................................................................................... 5

        4. PICO .......................................................................................... 5

        5. The "Tradehill" Transaction ...................................................... 6

PROCEDURAL HISTORY ................................................................................. 7

ARGUMENT ...................................................................................................... 8

POINT I

    The Government Should Be Ordered To Specify Whether Or Not It Is Alleging
    That The Tax Shelters Are Fraudulent As Designed .................................... 8

        A. The Applicable Law ............................................................................ 8

POINT II

    To The Extent The Indictment Alleges Fraud In The Design Of The
    Transactions, Counts Two, Three, Four And Seven Should Be Dismissed
    Because They Fail To Allege The Willful Violation Of A Known Legal Duty
    And Violate Shapiro's Right to Due Process Of Law .................................. 11

        A. Applicable Law ................................................................................. 12

           1. Willfulness ............................................................................... 12

           2. The Due Process Clause of the Fifth Amendment to the
              United States ........................................................................... 14

B.  Application to Tax Shelters.................................................................15

    1.  The Economic Substance and Business Purpose Doctrines .................15

    2.  The Technical Tax Interpretation............................................18

        a.  COBRA, Add-On and the Tradehill Transaction......................18

        b.  CDS...................................................................20

        c.  Noneconomic Loss Doctrine......................................21

POINT III

The Court Should Strike Certain Irrelevant and Prejudicial Surplusage from the
Indictment ........................................................................................23

    A.  The Applicable Law..............................................................24

    B.  The Irrelevant and Improper Characterization of Richard Shapiro
        Should be Stricken ...........................................................25

    C.  The References to "Other Things," "Other Steps," "Other Ways,"
        and "Other Entities" Represent Prejudicial Surplusage...................27

    D.  The Allegations Regarding the "Attorneys and Professionals Provided
        by E&Y" and that the CDS Partnerships were Invalid Should be Stricken
        as Irrelevant and Prejudicial.................................................29

CONCLUSION...........................................................................................31

# TABLE OF AUTHORITIES

## Cases

ACM Partnership v. Comm'r, 157 F.3d 231 (3d Cir. 1998)................................16

United States v. Alston, 77 F.3d 713, 718-21 (3d Cir. 1996).............................12

Black & Decker Corp. v. United States, 436 F.3d 431 (4th Cir. 2006)..............15

United States v. Brighton Bldg. & Maintenance Co., 435 F. Supp. 222
    (N.D. Ill. 1977)..........................................................................................27, 28

Cheek v. United States, 498 U.S. 192 (1991) ..................................12, 13, 17, 23

In re CM Holdings, 301 F.3d 96 (3d Cir. 2002) ................................................17

Coltec Indus., Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006)................16

Commissioner v. Groetzinger, 480 U.S. 23 (1987) ...........................................20

Compaq Computer Corp. v. Comm'r, 277 F.3d 778 (5th Cir. 2001) ................16

United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983) ........................12, 18

United States v. DeFabritus, 605 F. Supp. 1538 (S.D.N.Y. 1985) ........27, 28, 29

United States v. DePalma, 461 F. Supp. 778 (S.D.N.Y. 1978) ..........................27

Frank Lyon Co. v. United States, 435 U.S. 561 (1978)................................15, 16

Gitlitz v. Commissioner, 531 U.S. 206 (2001) ..................................................22

United States v. Harris, 942 F.2d 1125 (7th Cir. 1991)................................14, 23

Hart v. Commissioner, T.C.Memo. 1995-55, 1995 WL 37634
    (Feb. 1, 1995)..........................................................................................20

Helmer v. Commissioner, T.C. Memo 1975-160, 1975 WL 2787 (1975) .................18, 19

Horn v. Comm'r, 968 F.2d 1229 (D.C. Cir. 1992) ............................................16

United States v. Hubbard, 474 F. Supp. 64 (D.D.C. 1979).................................28

United States v. Killeen, 1998 WL 760237 (S.D.N.Y. Oct. 29, 1998)...............31

United States v. Klausner, 80 F.3d 55 (2d Cir. 1996).........................................................12

Klamath Strategic Inv. Fund LLC v. United States, 440 F.Supp.2d 608
   (E.D. Tex. 2006) ...................................................................................................19

Knetsch v. United States, 364 U.S. 361 (1960) ...............................................................17

United States v. Lanier, 520 U.S. 259 (1997).....................................................14, 15, 18

Long v. Comm'r, 71 T.C. 1 (1978)..................................................................................19

United States v. Mallas, 762 F.2d 361 (4th Cir. 1985) ...........................................13, 14, 17

United States v. Mango, No. 96 Cr. 327, 1997 WL 222367
   (N.D.N.Y. May 1, 1997)...............................................................................27, 28, 29

Mayer v. Commissioner, T.C.Memo. 1994-209, 1994 WL 184398
   (May 11, 1994).........................................................................................................20

McBoyle v. United States, 283 U.S. 25 (1931) ...............................................................14

United States v. McKee, 506 F.3d 225 (3d Cir. 2007) .....................................................12

United States v. Miller, 26 F. Supp.2d 415 (N.D.N.Y.1998) ................................24, 25, 26

United States v. Napolitano, 552 F. Supp. 465 (S.D.N.Y. 1982) .......................................26

Northern Ind. Pub. Serv. Co. v. Comm'r, 115 F.3d 506 (7th Cir. 1997)...........................17

United States v. Pirro, 212 F.3d 86 (2d Cir. 2000) ...................................13, 14, 17, 21, 23

United States v. Pope, 189 F. Supp. 12, 25-26 (S.D.N.Y. 1960)................................27, 28

United States v. Prejean, 429 F.Supp.2d 782 (E.D.La. 2006) ...........................................30

United States v. Regan, 937 F.2d 823 (2d Cir. 1991)........................................................13

Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89 (4th Cir. 1985)...........................15, 16

Salina Partnership LP v. Commissioner, T.C. Memo 2000-352,
   2000 WL 1700928 (2000)..........................................................................................19

Sanders v. Freeman, 221 F.3d 846 (6th Cir. 2000)...................................................15, 23

United States v. Santoro, 647 F. Supp. 153 (E.D.N.Y. 1986) ...........................................26

United States v. Scarpa, 913 F.2d 993 (2d Cir. 1990) ......................................................24

United States v. Strawberry, 892 F. Supp. 519 (S.D.N.Y. 1995) .......................................8

United States v. Stein, 424 F. Supp. 2d 720 (S.D.N.Y. 2006)............................................9

United States v. Stein, 429 F. Supp. 2d 633 (S.D.N.Y. 2006)...........................................10

United States v. Williams, 203 F.2d 572 (5th Cir.1953) ...................................................30

## Statutes & Rules

Rule 7 of the Federal Rules of Criminal Procedure...........................................................24

18 U.S.C. § 2.......................................................................................................................8

26 U.S.C. § 7201..................................................................................................................8

26 U.S.C. § 7206(1).............................................................................................................8

## Miscellaneous

Hariton, "Sorting Out the Tangle of Economic Substance," 52 Tax Law 235, 235
    (Winter 1999)................................................................................................................17

H.R. Rep. 108-477, 108th Cong., 2nd Sess. 2004, 2004 WL 960514 ...............................16

IRS Notice 99-59 ...............................................................................................................22

IRS Notice 2000-44 ...........................................................................................................22

IRS Notice 2000-60 ...........................................................................................................22

IRS Notice 2002-35 ...........................................................................................................21

Selling the "Noneconomic Loss Doctrine", 96 Tax Notes 415 (Jul. 15, 2002)...........22, 23

Treas. Reg. Sec. 1.752-6T, 68 F.R. 37434 (June 23, 2003)...............................................19

Defendant Richard Shapiro respectfully submits this memorandum of law in support of his motion (1) requiring the government to specify the nature of the criminality charged against him in the Superseding Indictment (the "Indictment"); (2) to dismiss certain of the charges against him; and (3) to strike surplusage from the Indictment.

### PRELIMINARY STATEMENT

The government has charged Shapiro in a sweeping indictment with conspiring to defraud the Internal Revenue Service (the "IRS"), aiding and abetting the tax evasion of several of high net worth clients of Ernst & Young ("E&Y"), and evading his own tax obligations. The conspiracy charged involves a complicated web of four separate types of tax shelters, multiple accountants, lawyers and investment advisors, and many wealthy, sophisticated taxpayers. The Indictment leaves one with the impression that the tax shelter transactions at issue had no basis under the tax law. That is misleading. Each of the transactions charged in the Indictment was designed to comply with the Internal Revenue Code (the "Code") and decades of precedent. There was no Code provision, Revenue Ruling, Treasury Regulation or court doctrine that prohibited the tax treatment claimed by the investors in the tax shelter transactions at the time they were entered into or at the time the investors filed their tax returns.

To determine whether the tax shelter transactions identified in the Indictment were viable under the tax law as it existed when the transactions were executed, two principal questions must be addressed. The first is whether, based on a technical interpretation of the Code, the desired tax consequences flow from those transactions. Assuming a positive answer to the first question, the second question is whether the transactions have sufficient business purpose and/or economic substance to support those tax consequences. As described in more detail below, the Indictment fails to address satisfactorily these questions or to give Shapiro fair notice of the charges against

him. Rather, the Indictment hopelessly blurs the distinction between the design and implementation of the transactions in question.

Admittedly, the answers to each of these two questions are complicated. As discussed in Point II below, a number of aspects of the law relating to these transactions were notoriously unclear or uncertain at the time the transactions were designed and approved. But the Supreme Court and the Second Circuit have held in criminal tax cases that where the law is unclear, the government cannot make the requisite showing of willfulness. In short, if the law is uncertain, there can be no violation of a known legal duty.

Moreover, principles of due process prohibit the government from holding a person criminally responsible for conduct he could not have reasonably understood was prohibited by the criminal law. Given the uncertainty governing the viability of the tax shelters identified in the Indictment at the time the transactions were analyzed and entered into, attaching criminal liability to the design of those transactions violates the constitutional doctrine of fair warning.

Finally, the Indictment contains several instances of prejudicial and irrelevant surplusage, including (1) an irrelevant description of Shapiro's employment prior to his tenure at E&Y that can only be intended to prejudice Shapiro by unfairly inflating the role that he played within the Strategic Individual Solutions Group ("SISG"); (2) thirty-three separate instances of broadening language that is so vague as to create a danger that the jury will infer that the defendants committed additional, uncharged crimes; and (3) two inaccurate and misleading allegations, one which calls into question the validity of the CDS partnerships, and a second which questions conduct on the part of attorneys and other professionals engaged by E&Y to represent its clients before the IRS. These instances of surplusage are both irrelevant and prejudicial; they should therefore be stricken.

## STATEMENT OF FACTS

**A.**   **Background**

According to the government, this case arises out of the defendants' involvement in

E&Y's marketing and promoting of "high-fee tax strategies for individual clients." (See

Indictment, ¶ 4.)  Between 1999 and 2001, E&Y marketed and promoted the four tax shelter

transactions at issue in this case:  COBRA (Currency Options Bring Reward Alternatives), CDS

(Contingent Deferred Swap), CDS Add-On ("Add-On") and PICO (Personal Investment

Company) (collectively, the "Tax Shelters").

For most of the period covered by the Indictment (1998 through 2006), defendants Robert

Coplan, Martin Nissenbaum and Shapiro were partners at E&Y and defendant Brian Vaughn was

an E&Y manager (and later became a partner of the firm) (together, Coplan, Nissenbaum,

Shapiro and Vaughn are referred to as the "E&Y Defendants").  Coplan was the head of SISG,

which marketed and promoted the Tax Shelters.  Nissenbaum and Shapiro, in addition to their

other responsibilities at E&Y, provided technical tax expertise to SISG.  Vaughn was a

salesperson for SISG.   Defendant Charles Bolton was the owner of an investment management

company, Bolton Capital Planning, that served as a general partner and investment manager for

most of the partnerships that participated in the CDS and the Add-On transactions.  Defendant

David L. Smith was the owner of another investment management company, Private Capital

Management Group, that served as a general partner and investment manager for the rest of the

partnerships that participated in the CDS and Add-On transactions.[1]

---

[1] Because Smith has yet to appear in this case, "Defendants" refers only to Coplan, Nissenbaum, Shapiro, Vaughn
and Bolton.

3

B.    **The Transactions**

The Indictment alleges that E&Y marketed and promoted approximately 218 of the Tax Shelters to approximately 402 of its clients from mid-1999 through 2001. (Indictment, ¶¶ 21, 27, 35, 54.) The government does not specify which, if any, of those transactions Shapiro assisted in promoting or marketing.

### 1. CDS

CDS is an acronym for Contingent Deferred Swap. (Indictment, ¶ 21.) As designed, a taxpayer invested in a securities trading partnership. (Id., ¶ 23(a).) The partnership conducted its trade or business by engaging in a large volume of short term trading activities for profit and by investing in an 18-month swap (an agreement to exchange streams of payments over time according to specified terms) with a bank counterparty. (Id., ¶¶ 23(c), (d).) The partnership used substantial leverage to increase the investment return on the swaps. (Id., ¶ 23(e).) In the first year, swap payments made on a periodic basis by the trading partnership were deducted as business expenses because of the "trading" characterization. (Id., ¶ 23(d).) If the swap was terminated early, but after 12 months, the lump-sum payment received by the trading partnership pursuant to the terms of the swap was designed to be taxed as long-term capital gain in year two. (Id., ¶ 23(f).)

### 2. COBRA

The COBRA transaction involved the simultaneous purchase and sale of a foreign currency long and short option each having matching 30-day maturities with a spread between the two options. (Id., ¶¶ 30(b), (c).) Depending on the movement of the foreign currency selected, within 30 days the holder of the two options stood to earn a profit above the amount he/she invested or he/she could lose the entire investment. (Id., ¶ 30(c).) Prior to maturity date,

the options were contributed to an investment partnership. (Id., ¶ 30(d).) When the partnership was liquidated after the options expired, a tax loss was realized and deducted by the investor. (Id., ¶ 30(e).)

### 3. Add-On

The CDS Add-On transaction is merely a combination of the CDS and COBRA transactions described above. (Id., ¶ 35.) CDS was designed so that income earned from the swap contracts in the partnership trading account would be realized in year two. (Id., ¶ 36.) The Add-On involved (in year two) a purchase and simultaneous sale of separate foreign currency options by the CDS partnership trading account. (Id., ¶ 37.) The result of the transaction was that the tax on the income earned in the swap contracts was deferred. (Id.)

### 4. PICO

The PICO transaction involved a taxpayer investing in a personal investment corporation ("S Corp") with other shareholders. (Id., ¶ 56(a).) The taxpayer owned 20% of the S Corp and the other shareholders owned the remaining 80%. (Id.) The S Corp invested in "financial instruments commonly known as 'straddles.'" (Id., ¶ 56(b).) The S Corp realized the gain portion of these investments within 60-90 days and the gain was allocated according to the ownership ratios. (Id.) Soon after, the 20% shareholder acquired the interests of the remaining shareholders. (Id., ¶ 56(c).) Once the taxpayer became the sole shareholder, the loss portion of the investments was realized. (Id.) The taxpayer contributed additional property to the S Corp to absorb the available loss and deducted that loss (capital or ordinary) on his return. (Id., ¶ 56(d).) The S Corp remains the taxpayer's investment vehicle. (Id., ¶ 57.)

### 5. The "Tradehill" Transaction

The Indictment alleges that, in the fall of 2000, Coplan, Nissenbaum and Shapiro (the "Tradehill defendants") "developed and utilized a tax shelter to evade their own taxes." (See id., ¶ 68.) The Tradehill transaction is substantially similar to the COBRA transaction described above. (Id.)

Despite the government's long history of not prosecuting taxpayers who invest in tax shelters (abusive or otherwise), see Affidavit of John J. Tigue, Jr., sworn to May 5, 2008 (the "Tigue Aff." or the "Tigue Affidavit"), at ¶ 16, the government has charged each of the Tradehill defendants with a single count of tax evasion relating to the Tradehill transaction. Thus, while the government normally reserves its most potent weapon, an indictment, to pursue the promoters that market and develop transactions that the government concludes lead to unjustifiable positions taken on the tax returns of individual taxpayers, because Shapiro is alleged to have encouraged others to invest in the Tax Shelters, he was unfairly selected to be charged with evasion of his own personal income taxes.[2] This is an overt attempt by the government to heap unfair and unwarranted additional punishment on Shapiro for his involvement in the design, marketing and implementation of the transactions – the same activity that is already being addressed in Counts One through Four of the Indictment.

---

[2] On April 18, 2008, defendants wrote a letter to the government requesting the government identify "all individual investors in any of the purported tax shelters described in the Superseding Indictment that have been or are being prosecuted by the United States Department of Justice . . . ." It also asked the government to identify any individual investors prosecuted "for investing in any other actual transactions promoted by accounting, investment, and/or law firms that the government claims (a) were designed to create the appearance of having been undertaken to generate profits, and (b) were actually intended to generate tax losses and deductions." (A copy of that letter is annexed to the Tigue Affidavit as Exhibit E.) The government has not responded to that request.

6

## PROCEDURAL HISTORY

On May 22, 2007, after a three-year investigation by the government, a grand jury returned an eight-count indictment charging defendants Coplan, Nissenbaum, Shapiro and Vaughn with one count of participating in a conspiracy (a) to defraud the United States, more specifically, the Internal Revenue Service ("IRS"); (b) to evade their own income taxes as well as the income taxes owed by E&Y clients and certain other E&Y partners; (c) to corruptly obstruct and impede the due administration of the internal revenue laws; and (d) to make false statements to the IRS. The initial indictment also charged (a) Coplan, Nissenbaum and Shapiro each with a single count of tax evasion, in violation of 26 U.S.C. § 7201; (b) Coplan and Nissenbaum each with a single count of obstruction of the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212; and (c) Coplan and Vaughn each with a single count of making false statements to the IRS, in violation of 18 U.S.C. § 1001.

On February 19, 2008, a grand jury returned the Indictment. (A copy of the Indictment is annexed to the Tigue Affidavit as Exhibit A.) The Indictment contains thirteen counts and adds two additional defendants – Bolton and Smith. The Indictment, like the original indictment, alleges that the defendants "participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the shelters were marketed and implemented." (Indictment, ¶ 13.) The Indictment retains all of the charges contained in the original indictment, adds Bolton and Smith to the conspiracy alleged in Count One, and removes obstruction of the internal revenue laws as an object of that conspiracy. Counts Two through Four of the Indictment charge the Defendants with aiding and abetting the income tax evasion of three E&Y clients that invested in CDS and/or the Add-On, in violation of

7

26 U.S.C. § 7201 and 18 U.S.C. § 2. Finally, the Indictment charges Smith with a single count

of tax evasion, in violation of 26 U.S.C. § 7201 and a single count of filing a false tax return, in

violation of 26 U.S.C. § 7206(1). The government has not charged Shapiro with obstruction or

the making of false statements to the IRS.

## ARGUMENT

## POINT I

### The Government Should Be Ordered To Specify Whether Or Not It Is Alleging That The Tax Shelters Are Fraudulent As Designed

As discussed in the Memorandum of Law in Support of the Discovery Motions Filed on

Behalf of all Defendants (hereafter, the "Joint Discovery Motion"), counsel for Nissenbaum

submitted a letter to the government requesting certain particulars on behalf of the defendants

(the "Nissenbaum Particulars Request"). (A copy of the Nissenbaum Particulars Request is

annexed to the Tigue Affidavit as Exhibit C.) In that letter, defendants asked the government to

furnish a bill of particulars answering the following question (the "Request"): "With respect to

each of the tax shelters as to which the government intends to offer proof, does the government

allege that the tax shelter was fraudulent as designed and approved by [E&Y], and if so, in what

respects?" Tigue Aff., Exhibit C, at 6. The government declined to answer the Request. (A

copy of the government's response to the Nissenbaum Particulars Request (the "Government's

Particulars Response") is annexed to the Tigue Aff. as Exhibit F.)

## A.    The Applicable Law

As presented more thoroughly in the Joint Discovery Motion at pages 5-7, a bill of

particulars is warranted when "the requested particularization is necessary to defendant's

preparation for trial and avoidance of unfair surprise at trial." United States v. Strawberry, 892

F. Supp. 519, 526 (S.D.N.Y. 1995) (Parker, J.).

8

In <u>United States v. Stein</u> (the "KPMG case"), the Honorable Lewis A. Kaplan <u>sua sponte</u> ordered the government to furnish a bill of particulars providing the very information the defendants in this case sought in the Request. <u>United States v. Stein</u>, 424 F. Supp. 2d 720, 724-25 (S.D.N.Y. 2006). Judge Kaplan decided that it was necessary for the government "to define with precision exactly what it mean[t] by devising, marketing, and implementing fraudulent tax shelters." <u>Id.</u> at 724. Judge Kaplan concluded that the indictment and certain government representations were consistent with at least two theories of the case. <u>Id.</u> at 724. The first theory was that the tax strategies themselves "clearly violated existing tax law, and the defendants nevertheless willfully implemented them." <u>Id.</u> The second was that the strategies, if "implemented through <u>bona fide</u> transactions, would not have involved criminal violations of the tax laws, but the defendants implemented them fraudulently by such measures as sham transactions, false tax returns, and the like." <u>Id.</u> In other words, Judge Kaplan wanted the government to clarify whether it claimed the strategies were fraudulent (a) in their design, or (b) in their implementation. Judge Kaplan concluded that "[t]he ramifications of the government proceeding on one track versus the other, or both, are profound, both for the defendants' ability properly to prepare for trial and for the conduct of the trial itself." <u>Id.</u> at 725.

The indictment in the KPMG case and the Indictment in this case address similar, although not identical, sets of facts and allegations. Both indictments charge the defendants with conspiracy to defraud the IRS by developing tax shelter transactions, marketing them to the high net worth clients of the respective accounting firms, and assisting the clients with implementation of those transactions. Both indictments also summarize the alleged misconduct with words like "devising, marketing, and implementing" in the KPMG case, <u>id.</u> at 724, and "designing, marketing, implementing and defending" in this case, (Indictment, ¶¶ 13, 14).

9

Although the Indictment here contains more detailed allegations about the actions the government alleges were part of the conspiracy, the ambiguity about the government's fundamental theory remains. While the government clearly alleges the transactions were fraudulent in their implementation, it is unclear whether it also claims that the transactions were fraudulent in their design. Thus, the Indictment contains numerous allegations claiming fraudulent <u>implementation</u> of each of the four types of transactions described above, but it does not allege that the <u>design</u> of any of these transactions was of a fraudulent nature. Given Shapiro's unique role, as alleged in the Indictment, as subject matter expert related to these transactions (Indictment, ¶ 9), he is entitled to be given fair notice of the nature of the charges against him.

Moreover, as set forth in Point II, below, to the extent the government claims that the transactions were fraudulent in their design, the Indictment should be dismissed because it fails to state an offense and violates Shapiro's due process rights.

Because of the substantive similarities to the KPMG case and the profound ramifications of the government's answer, this Court should order the government to provide a bill of particulars in response to the Request.[3]

---

[3] In response to Judge Kaplan's order in the KPMG case, the government stated that it would attempt to prove at trial that the transactions "as designed" were actually different than the transactions as described in various documents submitted to the IRS and defendants' papers moving to dismiss the indictment for violation of due process and failure to state an offense. (A copy of the government's bill of particulars in the KPMG case is annexed to the Tigue Affidavit as Exhibit H.) The government conceded that the transactions described in the documents at issue in the KPMG case, if "conducted with business purpose and profit motive and not part of a pre-arranged plan," might not be the basis for a criminally fraudulent opinion letter and "might legitimately minimize taxes." Tigue Aff., Exhibit H, at 3-4. As a result of the government's response to his question, Judge Kaplan denied all of the KPMG defendants' motions that were based on the issue of the legality of the transactions (i.e., failure to state an offense and violation of due process) because whether or not the transactions as described by the defendants in their papers or in the allegedly false opinion letters were lawful was irrelevant given the government's intent to prove that the transactions were not actually as represented in those documents. See United States v. Stein, 429 F. Supp. 2d 633, 638 (S.D.N.Y. 2006).

**POINT II**

**To The Extent The Indictment Alleges Fraud In The Design
Of The Transactions, Counts Two, Three, Four And Seven Should
Be Dismissed Because They Fail To Allege The Willful Violation Of A
Known Legal Duty And Violate Shapiro's Right to Due Process Of Law**

Shapiro is a tax expert with thirty-four years of experience in the area of taxation of financial products. See Affidavit of Richard Shapiro, sworn to May 5, 2008 ("Shapiro Aff."), at ¶ 3. During his thirteen-year tenure at E&Y, he has spent the majority of his time advising other partners' clients on the taxation of financial products and related transactions and securities taxation. Id., ¶ 5. He was and is a low-ranking partner at E&Y and, to his knowledge, consistently has been within the lowest paid group of partners at the firm. Id. While at E&Y, he has not held any executive title or position; his principal responsibility has been to act as a tax subject matter expert.

Shapiro's main role within SISG was to evaluate and approve the design of the transactions prior to their marketing and implementation. (Indictment, ¶ 9.) This is a prime reason that the Court should order the government to indicate whether it is claiming the transactions are fraudulent in their design versus their implementation. If, as we believe, the design of those transactions comported with the law as it stood at the time, then the government will not be able to prove that Shapiro violated a known legal duty by concluding that those transactions were viable under the Code. Furthermore, if the law upon which Shapiro based his conclusions was, at the time, so uncertain that he could not have reasonably understood that his approval of those transactions was prohibited by the criminal law, then the due process clause

11

requires that Counts Two, Three, Four and Seven against Shapiro be dismissed insofar as they rely on the design of the Tax Shelters.[4]

## A. Applicable Law

### 1. Willfulness

Counts Two, Three and Four of the Indictment charge Shapiro with aiding and abetting tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2, and Count Seven charges Shapiro with personal tax evasion in violation of 26 U.S.C. § 7201. The crime of tax evasion requires the government to prove "willfulness" in order to obtain a conviction. United States v. Klausner, 80 F.3d 55, 61 (2d Cir. 1996). Willfulness has been defined as the "voluntary, intentional violation of a known legal duty." Cheek v. United States, 498 U.S. 192, 200-01 (1991). In a criminal tax prosecution a defendant cannot be convicted unless the government proves, beyond a reasonable doubt, that the defendant actually knew (or consciously avoided knowing) that he or she was violating a known legal duty. Id. at 202 ("carrying [the government's] burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law he had a good-faith belief that he was not violating any of the provisions of the tax laws."); United States v. Dahlstrom, 713 F.2d 1423, 1428 (9th Cir. 1983) ("We are convinced that the legality of the tax shelter program advocated by the

---

[4] One of the objects of the conspiracy charged in Count One of the Indictment alleges that the defendants evaded their own income tax obligations and those of E&Y clients and certain E&Y partners. (Indictment, ¶¶ 93-94.) A second object was that the defendants "unlawfully, wilfully [sic], and knowingly would and did defraud the United States and the IRS." (Id., ¶ 92.) The second object is distinct from a conspiracy to commit an offense against the United States and is often referred to as a Klein conspiracy. See United States v. McKee, 506 F.3d 225, 238 n.10 (3d Cir. 2007.) The law is unclear as to whether the government must establish willfulness beyond a reasonable doubt in order to prove a Klein conspiracy. See, e.g., id. at 243, n.14 (willfulness is not an element of a Klein conspiracy); United States v. Alston, 77 F.3d 713, 718-21 (3d Cir. 1996) (government is required to prove willfulness regarding a Klein conspiracy). Requiring the government to prove willfulness is consonant with the law governing tax prosecutions in that it requires the government to shoulder the burden of proving, with respect to all of the counts charged, that Shapiro knew his activities were illegal. If this Court finds that willfulness is an element that the government must prove in order to convict Shapiro under Count One, for the reasons stated in this Memorandum of Law, the objects of the conspiracy relating to defrauding the IRS and evading income taxes should also be dismissed to the extent the government alleges the transactions were fraudulently designed.

[defendants] in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment. It is settled that when the law . . . is highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it." (internal citations omitted)). The Supreme Court has explained that the complexity of the tax laws mandates this special treatment for criminal tax offenses. <u>Cheek</u>, 498 U.S. at 200; <u>see also</u> <u>United States v. Regan</u>, 937 F.2d 823, 827 (2d Cir. 1991) (describing federal taxation as "one of the most esoteric areas of the law . . . replete with full-grown intricacies" (internal citations omitted)). As a result, criminal liability for tax offenses cannot be based on new or novel theories of tax law. <u>See</u> <u>United States v. Pirro</u>, 212 F.3d 86, 91 (2d Cir. 2000); <u>see also</u> <u>United States v. Mallas</u>, 762 F.2d 361, 363 (4th Cir. 1985) (reversing defendants' convictions for tax evasion because they rested on "an unsubstantiated theory of tax law.")

In <u>United States v. Pirro</u>, the defendant was charged with subscribing a false tax return in violation of 26 U.S.C. § 7206(1), a crime that also requires the government to prove willfulness. 212 F.3d at 88. The indictment alleged that the defendant's S Corp tax return was false because it failed to disclose another individual's interest in the S Corp. <u>Id.</u> The Second Circuit held that the allegation did not charge a violation of a known legal duty because "the government has conceded that there was no statute or regulation that specifically stated that S corporations were required to report 'ownership interests' on their corporate tax returns, nor has it provided Second Circuit or Supreme Court authority that so states." <u>Id.</u> at 90. Because the defendant had no legal duty to disclose the other individual's interest in the S Corp on the tax return, he could not be held criminally liable for failing to do so.

2.    **The Due Process Clause of the Fifth Amendment to the United States Constitution**

The Due Process Clause of the Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  Due process principles hold that a defendant cannot "be held criminally responsible for conduct [that] he could not reasonably understand to be proscribed." United States v. Lanier, 520 U.S. 259, 265-66 (1997); see also Pirro, 212 F.3d at 90-91 (upholding dismissal of count in indictment where the tax law provided no notice that defendant's act was criminal); United States v. Harris, 942 F.2d 1125, 1131 (7th Cir. 1991) (stating that criminal prosecutions "must rest on a violation of a clear rule of law" and if defendants in a tax case "could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards" (citing Mallas, 762 F.2d at 361)).

For this reason, the Supreme Court has said that criminal statutes must provide "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear." Lanier 520 U.S. at 265 (quoting McBoyle v. United States, 283 U.S. 25, 27 (1931)).  The fair warning requirement manifests itself in three ways: (1) "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application;" (2) the rule of lenity, or the canon of strict construction of criminal statutes operates such that any ambiguity in a criminal statute is resolved by applying the statute only to conduct clearly covered; and (3) the principle that the courts are barred from "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly

14

disclosed to be within its scope." Lanier, 520 U.S. at 266 (internal quotations and citations

omitted); see also Sanders v. Freeman, 221 F.3d 846, 852-53 (6th Cir. 2000) (stating that "[i]t is

well established that a statute must give a defendant 'fair notice that his contemplated conduct is

forbidden'" and that an individual can not be prosecuted for violating tax laws that are vague or

highly debatable).

**B.    Application to Tax Shelters**

As stated above, in order to determine whether tax shelters are legally viable, there are

two principal questions that must be asked.  The first is whether, based on a technical

interpretation of the Code, the desired tax consequences flow from a particular transaction.  The

second is whether a particular transaction has sufficient business purpose and/or economic

substance to support that technical tax interpretation.  We address the business purpose and

economic substance question first.

**1.    The Economic Substance and Business Purpose Doctrines**

Courts generally base their inquiry into whether a transaction should be respected for tax

purposes, or whether it is, instead, a sham transaction to be disregarded, on two factors:  (1) the

objective economic substance of the transaction, and (2) the subjective business motivation

behind it.  Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91-92 (4th Cir. 1985) (citing

Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978)).  Although it may appear to be a

straightforward analysis, courts have approached the inquiry in different ways.

For example, the United States Court of Appeals for the Fourth Circuit has held that the

tax benefits of a transaction will be denied only where (i) the taxpayer has no subjective business

purpose other than obtaining tax benefits, and (ii) the transaction objectively lacks economic

substance because no reasonable possibility of a pre-tax profit exists.  Black & Decker Corp. v.

15

United States, 436 F.3d 431, 441 (4th Cir. 2006); Rice's Toyota World, 752 F. 2d at 91-92.  That

court treated economic substance and business purpose as two prongs of a disjunctive test – if

either prong was satisfied, the taxpayer would be successful.  See Rice's Toyota World, 752 F.2d

at 91-92 ("[S]uch a test properly gives effect to the mandate of the Court in Frank Lyon that a

transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance

considerations." (emphasis added)).  Other circuits have followed the Fourth Circuit's lead in

this area.  Compaq Computer Corp. v. Comm'r, 277 F.3d 778, 781 (5th Cir. 2001); Horn v.

Comm'r, 968 F.2d 1229, 1237 (D.C. Cir. 1992).

    Some courts, however, have found that an objective lack of economic substance, on its

own, is sufficient to defeat a transaction and that an individual's subjective business purpose

cannot save a transaction once lack of economic substance is shown.  Coltec Indus., Inc. v.

United States, 454 F.3d 1340, 1355 & n.14 (Fed. Cir. 2006).  Furthermore, some courts find that

business purpose and economic substance are merely factors to be considered when determining

whether a transaction should be respected for tax purposes.  See, e.g., ACM Partnership v.

Comm'r, 157 F.3d 231, 247 (3d Cir. 1998) ("[T]hese distinct aspects of the . . . inquiry do not

constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both

of which inform the analysis of whether the transaction had sufficient substance, apart from its

tax consequences, to be respected for tax purposes." (citation omitted)).[5]

    Even the answer to the question of what exactly is sufficient economic substance is not

clear.  Although some courts look to the profit potential of a transaction, most are hesitant to

require a specific amount of profit.  See Compaq, 277 F.3d at 786 (reversing a Tax Court

---

[5] Even Congress has not been able to come to an agreement on what the test should be.  In 2003 and 2004, Congress introduced numerous pieces of legislation that attempted to clarify the inquiry (thereby confirming the doctrine's current lack of clarity).  None of that legislation passed.  See, e.g., H.R. Rep. 108-477, 108th Cong., 2nd Sess. 2004, 2004 WL 960514.

decision that a transaction lacked economic substance where the pretax profit was insignificant in relation to the large tax benefits obtained); <u>Northern Ind. Pub. Serv. Co. v. Comm'r</u>, 115 F.3d 506, 512-13 (7th Cir. 1997) (respecting transaction even though the profit was only equal to a one percent return because the profit was real profit earned from the activities of the taxpayer). Some courts have held that the answer is not based on whether there is profit potential, but instead on whether the transaction results in any practical economic effects other than the creation of tax losses. <u>See</u> <u>In re CM Holdings</u>, 301 F.3d 96, 103 (3d Cir. 2002); <u>Knetsch v. United States</u>, 364 U.S. 361, 366 (1960); <u>see generally</u> Hariton, "Sorting Out the Tangle of Economic Substance," 52 Tax Law 235, 235 (Winter 1999) ("the economic substance doctrine is not just a smell test, because it . . . permits taxpayers to retain even the most egregious tax benefits if they arise from transactions with meaningful economic consequences").

If the government's theory is that the transactions Shapiro approved were fraudulent in their design, this lack of clarity in the economic substance and business purpose doctrines is fatal to that theory for two reasons. First, the government will not be able to prove, as required by <u>Cheek</u>, that Shapiro actually knew that he was violating a known legal duty by evaluating and, in some cases, approving the tax shelters. <u>Cheek</u>, 498 U.S. at 200. For example, the government concedes that in COBRA, "the options had some chance of earning the clients a profit after the fees were paid." (Indictment, ¶ 29.) Because the question of what is sufficient economic substance is unclear, the fact that the investors in COBRA transactions had some chance of earning a profit supports the viability of the transaction and, thus, the government cannot establish that Shapiro had the intent necessary to violate any provision of the tax laws. <u>Pirro</u>, 212 F. 3d at 91 (citing <u>Mallas</u>, 762 F.2d at 363 ("It is settled . . . that where the law is vague or highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it."));

17

see also Dahlstrom, 713 F.2d at 1428 ("We are convinced that the legality of the tax shelter program advocated by the [defendants] in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment. It is settled that when the law . . . is highly debatable, a defendant, actually or imputedly – lacks the requisite intent to violate it." (internal citations omitted)).

Second, the lack of clarity in this area results in a situation where "men of common intelligence must necessarily guess at [the] meaning [of these doctrines] and differ as to [their] application." Lanier, 520 U.S. at 266. When circumstances like this exist, there is no fair warning of when one has crossed the line so as to be subject to criminal charges. If Shapiro did not have fair warning that his evaluations of the design of the Tax Shelters could subject him to criminal charges, he cannot be held criminally liable for those acts.

### 2. The Technical Tax Interpretation

#### a. COBRA, Add-On and the Tradehill Transaction

As stated above, the other question to be answered when evaluating the viability of a tax shelter is whether, based on a technical interpretation of the Code, the desired tax consequences properly flow from a particular transaction. The Indictment alleges that the E&Y Defendants concluded that each COBRA investor could claim that his tax basis in the partnership interest was equal to the cost of the long option because the short option was a contingent liability that did not decrease the investors' basis in his partnership interest. Because of this, when the low-value asset – the only asset owned by the partnership at that time – was sold, it would result in a purportedly artificial loss. (See Indictment, ¶ 30(e).) What the Indictment does not explain is that the conclusion of the E&Y defendants was supported by the principle announced by the Tax Court in Helmer v. Commissioner, T.C. Memo 1975-160, 1975 WL 2787 (1975). In that case,

18

the IRS successfully argued that no liability arose and no adjustments could be made to a taxpayer's basis in his or her partnership interest because the obligation at issue was contingent. Helmer, 1975 WL 2787, at *2; see also Long v. Comm'r, 71 T.C. 1, 7 (1978), aff'd in part and rev'd in part on other grounds, 660 F.2d 416 (10th Cir. 1981) (although they may be considered liabilities in the generic sense of the term, "contingent or contested 'liabilities' . . . are not liabilities for partnership basis purposes at least until they have become fixed or liquidated"). The Tax Court cited Helmer favorably as recently as 2000. See Salina Partnership LP v. Commissioner, T.C. Memo 2000-352, 2000 WL 1700928 (2000). It was not until June 2003 that the IRS issued a temporary regulation repealing, retroactively, the rule established in Helmer. See Treas. Reg. Sec. 1.752-6T, 68 F.R. 37434 (June 23, 2003). As recently as 2006, a court has held that a transaction relying on the principal in Helmer, implemented before the issuance of the Treasury Regulations, was viable from a technical tax perspective. Klamath Strategic Inv. Fund LLC v. United States, 440 F.Supp.2d 608, 617-18 (E.D. Tex. 2006).

The last COBRA and Add-On transactions were executed by the fall of 2000. (Indictment, ¶¶ 27, 35.)[6] Similarly, the COBRA-like Tradehill transaction was executed in the fall of 2000 and reflected on the Tradehill defendants' tax returns filed in 2001. (Id., ¶¶ 73, 80.) The Helmer rule was not repealed until well after the final tax return was filed. Thus, during the entire time that the COBRA and Add-On transactions were being marketed and promoted, and during the time the Tradehill transaction was being executed, there was clear legal support for the tax consequences of investment in the foreign currency options of those transactions. Given the substantial authority supporting COBRA from a technical tax perspective, criminal liability cannot possibly ensue.

---

[6] As described above, the Add-On transaction had many of the attributes of the COBRA transaction. See supra 5.

19

b.    **CDS**

With respect to CDS, the Indictment alleges that because the funds in the trading partnership were generally used to carry out a high volume of short-term trades that consisted largely of trades designed to preserve the client's capital, the partnership could not be characterized as a trade or business and thus its swap payments to the financial institution did not qualify as business deductions.  (See id., ¶ 23(c), (d).)  The Indictment, however, ignores the fact that, at the time CDS was designed and promoted, the phrase "trade or business" was nowhere defined in the Code (and it still is not today).  Instead, the issue was generally left to courts to resolve.  Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987).  The courts developed a conjunctive two part test:  the taxpayer's trading must be substantial and the taxpayer must intend to profit from short-term market swings rather than derive income from interest, dividends and long-term appreciation.  Mayer v. Commissioner, T.C.Memo. 1994-209, 1994 WL 184398, at *5 (May 11, 1994).  The application of this test has resulted in an overall understanding that the substantial trading prong requires frequent, regular and continuous trading activity.  Hart v. Commissioner, T.C.Memo. 1995-55, 1999 WL 37634, at *2 (Feb. 1, 1995).  The Indictment concedes that the CDS partnerships conducted a high volume of short-term trades.  (Indictment, ¶ 23(c).)  Thus, in light of the relevant case law, the government's conclusion that the partnership could not be characterized as a trade or business is belied on the face of the Indictment.  Under the law as it existed at the time, it was accurate to characterize the partnership as engaging in a "trade or business."

The same analysis applies to the government's allegation that the early termination payments received by CDS partnerships from the financial institutions were fraudulently characterized as capital gains.  (Indictment, ¶ 23(f).)  Similar to the situation in Pirro, where the

20

Code did not expressly address whether there was a duty to include certain information on an S

Corp tax return, the Regulations under Section 446 of the Code governing notional principal

contracts (swaps) and the rules concerning the timing of income and deductions associated with

the payments made under those types of contracts did not expressly address the character of

payments made under such contracts. Pirro, 212 F.3d at 91. Thus, this aspect of the CDS

transaction complied with the technical requirements of the Code at the time and there was no

prohibition against investors treating the early termination payment as capital gain. It was not

until May 6, 2002, when the IRS issued Notice 2002-35, that the IRS challenged CDS and

maintained for the first time that it did not comport with the IRS's interpretation of the Code.

See I.R.S. Notice 2002-35, 2002-21 I.R.B. 992 (May 6, 2002). The last CDS transactions

(including those incorporating the Add-On) were executed in 2001. (See Indictment, ¶ 21.)

Thus, during the entire time that SISG was marketing and promoting CDS, the relevant law

supported the tax consequences of those transactions.[7]

### c.    Noneconomic Loss Doctrine

Finally, with respect to all of the transactions, the Indictment alleges that the investors in

COBRA, the Add-On, PICO and the Tradehill transaction took "artificial" losses to which they

were not entitled because there "were no corresponding economic losses suffered by the client."

See Indictment, ¶ 30(e) (COBRA); id., 38 (Add-On); id., 127(b) (Tradehill transaction); id., ¶

56(c) (PICO).[8] The Indictment does not indicate what Code provision or court doctrine it is

relying upon when making that assertion, although it appears likely that the government is

---

[7] With respect to the PICO transaction, the only technical tax issue raised by the government on the face of the Indictment concerns the "artificial" losses to which the PICO investors were not entitled because they suffered no corresponding economic losses. (Indictment, ¶ 56(c).) That issue is addressed below in the discussion of the noneconomic loss doctrine.

[8] The Indictment does not contain similar allegations with respect to CDS.

pointing to the IRS's view that a tax loss should be disregarded when it is not related to an

equivalent economic loss by the taxpayer. This view has been branded the "noneconomic loss

doctrine" by some commentators. See Lemons, et al., Selling the "Noneconomic Loss

Doctrine", 2002 TNT 136-26 (Jul. 15, 2002). The IRS first asserted this view in Notice 99-59

and has since repeated it in a number of additional notices. See, e.g., Notice 99-59, 1999-52

I.R.B. 761 (Dec. 10, 1999); Notice 2000-44, 2000-36 I.R.B. 255 (Aug. 13, 2000); Notice 2000-

60, 2000-49 I.R.B. 568 (Nov. 17, 2000). The IRS claims that the law relating to Code section

165(a) is the basis for its view, although the Code and the case law do not support that

proposition. See Lemons, 2002 TNT 136-26, at 7-8. The IRS has chosen not to issue a

regulation in a long running, vague and oft-disputed area of the tax law.

It is, therefore, notable that the IRS's view of noneconomic losses was not, at the time the

transactions at issue in the Indictment were developed, marketed and implemented, supported by

language in the Code, Regulations or court decisions. See id. at 3 (analyzing the authority upon

which the IRS bases its view regarding so-called noneconomic losses and concluding that the

doctrine "is actually a concept patched together out of snippets of dicta (taken out of context, we

might add) in an obvious attempt to employ this new weapon in the Service's 'war on tax

shelters'").

In fact, "there is a plethora of authority demonstrating that a noneconomic loss can and

will be recognized when the relevant code provisions dictate such a result." See id., at 10; see

Gitlitz v. Commissioner, 531 U.S. 206 (2001) (although loss based on increased basis was

wholly uneconomic the plain language of the Code section at issue allowed the taxpayer to take

the loss). For example, the step-up in basis granted at death can result in a loss that is

noneconomic to the beneficiary of the estate at issue. Also, deductions for depreciation and

amortization are allowed even when a building has nominal or no value. See Lemons, 2002 TNT 136-26, at 14. Thus, during the time period at issue, there was no law stating that a loss would be disregarded if there was no corresponding economic loss suffered by the client.

* * *

The Indictment alleges that Shapiro's main role in SISG was to evaluate transactions brought to him for review. (See Indictment, ¶ 9.) As shown above, at the time the Tax Shelter transactions were developed and marketed, and at the time Shapiro invested in the Tradehill transaction, substantial legal authority supported Shapiro's evaluation of the transactions. The government has the burden to prove that Shapiro knew that the transactions at issue were not viable under internal revenue laws, Cheek, 498 U.S. at 200-01; Pirro, 212 F.3d at 90, and that he had clear notice that his conduct was unlawful, Sanders, 221 F.3d at 852-53; Harris, 942 F.2d at 1131. To the extent the Indictment charges criminal violations in the design of the Tax Shelters, the government cannot demonstrate that the transactions clearly violated the prevailing law (as set forth in Tax Court decisions, IRS regulations and Code provisions). As a result, Counts Two, Three, Four and Count Seven of the Indictment should be dismissed as to Shapiro insofar as they allege criminality in the design of the Tax Shelters.

### POINT III

### The Court Should Strike Certain Irrelevant and Prejudicial Surplusage from the Indictment

The Indictment contains several instances of prejudicial and irrelevant surplusage. First, the government has included an irrelevant description of defendant Shapiro's prior employment, which ended when he began his employment at E&Y more than three years before the claimed start of the conspiracy. This description should be stricken because it can only be intended to prejudice Shapiro by unfairly inflating the role that he played within SISG. Second, the

23

government has included thirty-three separate instances of broadening language that render the Indictment so vague as to be of no use to the defendants in preparing their defense, while creating the danger that the jury will infer that the defendants committed additional, uncharged crimes. Third, the government has included two inaccurate and misleading allegations calling into question the validity of the CDS partnerships as well as conduct on the part of attorneys and other professionals engaged by E&Y to represent its clients before the IRS. These instances of surplusage are both irrelevant and prejudicial; they should therefore be stricken.

## A.    The Applicable Law

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The government has utterly ignored this dictate by filing 107 pages of endless, non-essential allegations.

Pursuant to Rule 7(d), "[t]he Court on motion of the defendant may strike surplusage from the indictment or information." This "rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d) Advisory Committee Note; see also United States v. Miller, 26 F. Supp.2d 415, 420 (N.D.N.Y.1998) ("The purpose of Rule 7(d) is to protect the defendant against prejudicial allegations of irrelevant facts"). A motion to strike surplusage will be granted when it is clear that the challenged terms are "not relevant to the crime charged, and are inflammatory and prejudicial." United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990) (citing United States v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).

**B.**    **The Irrelevant and Improper Characterization of Richard Shapiro Should be Stricken**

The introductory section of the Indictment describes Shapiro's prior employment as "the Director of Tax for the Financial Services Industry Practice at another large accounting firm." (See Indictment, ¶ 9.)  This reference to Shapiro's title at his prior employment is immaterial, irrelevant and prejudicial and should be stricken.  See United States v. Miller, 26 F. Supp.2d 415, 420 (N.D.N.Y. 1998) (striking descriptions of defendants that the court deemed prejudicial and irrelevant to the charged money laundering and racketeering conspiracies).  Shapiro's previous position has no bearing on his part in the charged criminal conduct, all of which, the government alleges, arises from his current employment.

Furthermore, the Indictment's reference to Shapiro's prior employment can only be intended to prejudice him and confuse the jury by making him appear to have played a larger role in the charged conduct than the facts would otherwise establish.  Shapiro held no title at E&Y, was not the National Director of any of E&Y's tax practices, and for a good part of the period covered by this Indictment, was not a member of the PFC section of National Tax or even a member of SISG.  (See Indictment, ¶ 9.)  The Indictment does not allege that he was entrusted with any supervisory or strategic authority with regard to the conduct charged therein.

From 1990 to 1994, Shapiro worked at the firm of Grant Thornton LLP, serving as that firm's Director of Tax for the Financial Services Industry Practice.  See Shapiro Aff. at ¶ 4.  That job not only pre-dated the charged conspiracy by 4 to 8 years, but it had nothing to do with tax shelters.  (See Indictment, ¶ 4.)  See Shapiro Aff., ¶ 4.  Shapiro is not alleged to have had anything to do with tax shelters until sometime in 1998.  (See Indictment, ¶ 9.)  If the government proves the other allegations in paragraph 9 it will establish that Shapiro:  (1) is a lawyer; (2) has a Masters in Taxation; (2) was a partner in E&Y's New York office; (4) was a

subject matter expert in the taxation and the structuring of financial products and instruments; (5) worked regularly with Viper/SISG personnel from early 1998; (6) joined Viper/SISG in 2000; (7) worked closely with defendants Coplan and Nissenbaum in evaluating tax shelters; (8) played an essential role in the approval process of Viper/SISG tax shelters; and (9) participated in sales presentations to clients. Legally speaking, that is enough. The government is not entitled to attempt to confuse the jury by proving that before Shapiro came to work at E&Y in 1995, he had another job with a title having nothing to do with tax shelters.

While courts have sometimes held that the description of a defendant's position was relevant, and therefore did not constitute surplusage, they have generally done so when the indictment purported to describe the defendant's position during the period covered by the conspiracy. In those instances, the description operated to illuminate the structure of a criminal enterprise as well as the defendant's role within it. See Napolitano, 552 F. Supp. at 480 (terms explaining positions in an enterprise not stricken because they were explanatory and tended to clarify the structure of the enterprise and the role each defendant played); see also United States v. Santoro, 647 F. Supp. 153, 177 (E.D.N.Y. 1986) (the identity of the enterprise in question and the positions the defendants held within the enterprise were relevant to the presentation of the government's case). In contrast, the reference to Shapiro's prior employment does not bear on his alleged role in the charged criminal conduct. See Miller, 26 F. Supp.2d at 420 (language in an indictment may be stricken when it is prejudicial and "irrelevant to the crime charged").

In Miller, the Court found that the indictment's description of defendants as a "paramilitary group," known as the "Warriors Society," that had had prior conflicts with the New York State Police, was highly prejudicial as well as irrelevant to the money laundering and racketeering conspiracies with which the defendants were charged. While the Indictment's

description of Shapiro as a former "Director of Tax for the Financial Services Industry Practice" clearly does not carry the stigma of membership in a paramilitary group, it is unrelated to the charged conduct and unfairly encourages the jury to perceive him as being on the same level as the members of the PFC group and other key decision-makers. As such, it should be stricken as prejudicial surplusage.

## C.    The References to "Other Things," "Other Steps," "Other Ways," and "Other Entities" Represent Prejudicial Surplusage

As described in defendants' joint discovery motion, the Indictment repeatedly alleges that the specified acts were "among other things" committed by the defendants, or uses similar broadening language.[9] The defendants have asked the Court to order the government to particularize these open-ended allegations. However, even if the government provides a bill of particulars, it will not cure the prejudice that will arise from the allegations in the Indictment.

Judges in this district and elsewhere have recognized that the inclusion of phrases such as "among other things" creates a danger that the jury may be misled into inferring that the defendant is accused of crimes beyond those actually charged. United States v. Pope, 189 F. Supp. 12, 25-26 (S.D.N.Y. 1960) (Weinfeld, J.); see also United States v. Mango, No. 96 Cr. 327, 1997 WL 222367, *16-*17 (N.D.N.Y. May 1, 1997); United States v. Brighton Bldg. & Maintenance Co., 435 F. Supp. 222, 230-31 (N.D. Ill. 1977). Thus, courts have repeatedly stricken allegations charging defendants with unspecified "other things." See Mango, 1997 WL 222367 at *16-*17; United States v. DeFabritus, 605 F. Supp. 1538, 1547 (S.D.N.Y. 1985) (Edelstein, J.); United States v. DePalma, 461 F. Supp. 778, 798-99 (S.D.N.Y. 1978) (Sweet, J.);

---

[9] Such broadening language is contained within each of the following thirty-three paragraphs and subparagraphs: 8, 31, 32, 33(a), 33(b), 33(c), 34, 51, 58, 62(a), 62(b), 62(c), 62(d), 65, 66, 67, 78, 79, 86, 87, 89, 96, 96(g), 103, 105, 110, 113, 122, 124, 125, 127, 140, and 141.

27

Pope, 189 F. Supp. at 25-26; see also United States v. Hubbard, 474 F. Supp. 64, 82 (D.D.C.

1979); Brighton Bldg. & Maintenance, 435 F. Supp. at 230-31.

In Pope, the defendants were accused of making false and misleading statements in proxy

statements.  Ten counts in the indictment charged the defendants with having made specific false

statements of material fact "among other things."  Pope, 189 F. Supp. at 25.  In striking the

offensive language, Judge Weinfeld noted that the prejudice resulting from the inclusion of such

broadening language extends beyond the failure to inform the defendants of the charges:

> The grand jury has delineated the alleged false and misleading
> matter contained in the proxy statements upon which it based the
> accusations against the defendants.  The words "among other
> things" add nothing to the charges and give the defendants no
> further information with respect to them.

Id. at 25-26.  While recognizing that striking the surplusage would not foreclose the receipt in

evidence of matters relevant to the issues under indictment, the Court cautioned that such

broadening language cannot be used to usurp the grand jury's function and to prosecute the

defendants on charges beyond those upon which the indictment was returned.  Id. at 26.

In DeFabritus, the defendant was charged with preparing false corporate tax returns.

DeFabritus, 605 F. Supp. at 1541-42.  The indictment alleged that "corporate monies were used,

among other things, for the construction and improvement of personal residences," and that the

defendant and his co-conspirators "concealed, among other things, the true nature of the

payments and their own tax liability for the monies they received . . . ."  Id. at 1547 n.11

(emphasis added).  The Court ordered the words "among other things" stricken, reasoning that

the language did not add anything to the charges in the indictment and would lead the jury to

draw improper inferences regarding other crimes not charged in the indictment.  Id. at 1547.

28

Similarly, in <u>Mango</u>, the Court granted a motion to strike surplusage from an indictment charging defendants with conspiring to violate the Clean Water, Mail Fraud, and Bank False Reporting Acts, and with substantive counts of violating the Clean Water Act in connection with the construction of a natural gas pipeline. <u>See</u> <u>Mango</u>, 1997 WL 222367 at *1, *16-*17.  One paragraph in the indictment alleged that a company of which one defendant was an officer had "represented to each landowner that the pipeline would be built in conformity with, among other things, [certain] requirements." <u>Id.</u> at *15 (emphasis added).  The Court struck this broadening language, reasoning that it added nothing to the charges and would allow the jury to draw the inference that defendants were accused of crimes not charged in the indictment. <u>Id.</u> at *16.  The Court also struck similar broadening language contained in nine additional paragraphs of the indictment. <u>Id.</u> at *16-*17.

Here, like the broadening language stricken in <u>Pope</u>, <u>DeFabritus</u> and <u>Mango</u>, the previously identified portions of the Indictment create the unfair danger that a jury will infer that the defendants committed crimes in addition to those set forth in the Indictment.  As such, this prejudicial surplusage should also be stricken.

**D.      The Allegations Regarding the "Attorneys and Professionals Provided by E&Y" and that the CDS Partnerships were Invalid Should be Stricken as Irrelevant and Prejudicial**

Finally, the government has included in the Indictment two inaccurate and misleading allegations that call into question the validity of the CDS trading partnerships and suggest that attorneys and professionals suborned perjury.  (<u>See</u> Indictment, ¶¶ 23(b), 65.)  These allegations are both irrelevant and prejudicial, and should therefore be stricken.

Paragraph 65 of the Indictment alleges that "[r]epresented by attorneys and professionals provided by E&Y, various tax shelter clients and their financial advisors gave false and

misleading testimony and statements to the IRS concerning, among other things, the clients'

motivations for entering into the tax shelter transactions in question." The clause "[r]epresented

by attorneys and professionals provided by E&Y" offers nothing to the allegation that tax shelter

clients and their financial advisors provided false testimony other than the suggestion that the

attorneys and professional knew of or suborned this false testimony. Such a suggestion is highly

prejudicial because it attempts to link the investment strategies at issue in this case with

unrelated and unsubstantiated immoral conduct for the purpose of coloring the jury's perception

of those investment strategies. See United States v. Prejean, 429 F.Supp.2d 782, 796 (E.D. La.

2006) ("a court may strike as surplusage any '[i]ndirect expressions, implied allegations,

argumentative statements, and uncertainty due to generalizations in language'" (citing United

States v. Williams, 203 F.2d 572, 574 (5th Cir.1953)).

Moreover, this allegation is wholly irrelevant. The government does not allege that any

of the defendants represented the clients or their advisors before the IRS, nor does it suggest that

the unnamed attorneys and professionals were unindicted co-conspirators. Because the clause

"[r]epresented by attorneys and professionals provided by E&Y" adds nothing to the charges

presented in the Indictment and serves only to prejudice the defendants, it should be stricken.

Finally, paragraph 23(b) alleges, with respect to CDS, that: "[a]fter determining how

much ordinary income the client wished to shelter from taxes in Year 1, the conspirators would

typically arrange for the client to contribute approximately one-third of that amount ($6.6 million

in the typical example) to the purported 'trading partnership'." (See Indictment, ¶ 23(b)

(emphasis added).) This use of the term "purported" to describe the CDS trading partnerships is

inaccurate, irrelevant, and misleading. It suggests that either the partnerships themselves, or the

trades executed in their names, were not authentic. Such a characterization is misleading and

30

inaccurate because the entities were legally-formed partnerships and actively engaged in short term trading.[10] As such, it should be stricken. See United States v. Killeen, 1998 WL 760237 at *4 (S.D.N.Y. Oct. 29, 1998).

## CONCLUSION

For all of the foregoing reasons, this Court should grant defendant Shapiro's motion (1) requiring the government to specify the nature of the criminality charged against him; (2) to dismiss the charges against him; and (3) to strike surplusage from the Indictment.

Dated: May 5, 2008
New York, New York

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.


By: /s/ John J. Tigue, Jr.
    John J. Tigue, Jr.
    565 Fifth Avenue
    New York, NY 10017
    (212) 856-9600

---

[10] The fact that the trading partnerships engaged in valid trades is made clear in paragraph 23(c), which notes that the trading partnerships did, in fact, engage in a "high volume of short-term trades." (See Indictment, ¶ 23(c).)

31